MARICOPA COUNTY, a body politic,
Plaintiff,

v.

AMERICAN PIPE AND CONSTRUC-
TION CO., American Concrete Pipe Co.,
Kaiser Steel Corporation, Smith-Scott,
Inc., United Concrete Pipe Corporation,
United States Steel Corporation, Mar-
tin-Marietta Corporation, United States
Industries, Inc., Arizona Concrete Pipe
Co., Six Points Lumber & Supply Co.,
dba O'Malley Gannaway Concrete Pipe
Co., all corporations, Defendants.

Civ. A. No. 69–149 PHX.

United States District Court
D. Arizona.
Aug. 1, 1969.

Moise Berger, Maricopa County Atty., Phoenix, Ariz., for plaintiff; Albert Firestein, Ronald W. Meyer, Deputy County Attys.

George W. Jansen, Wayne M. Pitluck, James O. Sullivan, Sullivan, Jones & Mitchell, San Diego, Cal., Robert C. Hackett, Shimmel, Hill & Bishop, Phoenix, Ariz., for American Pipe and Construction Co. and American Concrete Pipe Co.

Gordon Johnson, Thelen, Marrin, Johnson & Bridges, San Francisco, Cal., for Kaiser Steel Corp.

John J. Hanson, Robert E. Cooper, Gibson, Dunn & Crutcher, Los Angeles, Cal., for Smith-Scott, Inc. and United Concrete Pipe Corp.

Jesse R. O'Malley, Musick, Peeler & Garrett, Los Angeles, Cal., for United States Steel Corp.

Gordon F. Hampton, Don T. Hibner, Pierce T. Selwood, Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., for Martin-Marietta Corp.

Oliver F. Green, Jr., Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for United States Industries, Inc.

R. E. Johnson, Johnson, Bebeau & Timbanard, Phoenix, Ariz., for Arizona Concrete Pipe Co.

Newman R. Porter, Evans, Kitchel & Jenckes, Phoenix, Ariz., for Six Points Lumber & Supply Co.

## DECISION ON DEFENDANTS' MOTIONS TO DISMISS AND/OR FOR SUMMARY JUDGMENT

PENCE, District Judge.

The defendants above named have each and all filed motions to dismiss and/or for summary judgment against the plaintiff, maintaining that its Sherman 1 and 2 antitrust action is barred by the statute of limitations and laches. Some defendants have raised additional grounds, fully discussed hereafter. The chronological sequence of events preceding the filing of plaintiff's action on April 19, 1969, and its amended complaint on May 22, 1969 is therefore important.

## CHRONOLOGY OF EVENTS

On March 10, 1964, the United States Grand Jury at Los Angeles returned five indictments against defendants American Pipe and Construction Co. (American), United Concrete Pipe Corporation (United), Kaiser Steel Corporation (Kaiser), United States Steel Corporation (U. S. Steel), United States Industries (USI), and Smith-Scott, Inc. (Smith-Scott), charging them (and certain of their officers) with combining and conspiring together in restraint of interstate trade in steel and concrete pipe, in violation of 15 U.S.C. § 1 (Sherman 1), in that they submitted collusive and rigged bids for the sale of such pipe, and allocated and divided business among themselves.[1] On June 19, 1964, pleas of

---

*nolo contendere* were made by all defendants and judgments of guilt were entered.

On June 23, 1964—four days later— the government filed civil actions in the United States District Court at Los Angeles against the same defendant corporations. In C.A. 64832, American and United were named defendants; in C.A. 64833, Kaiser and U. S. Steel were named defendants; in C.A. 64834, United, American, Kaiser and U. S. Steel were named defendants; in C.A. 64835, USI, Smith-Scott, U. S. Steel, American and United were named defendants; in C.A. 64836, U. S. Steel, Smith-Scott and USI were named defendants.[2] In these five government civil actions the United States predicated the complaints upon 31 U.S.C. §§ 231–233 (False Claims Act) and 15 U.S.C. § 15a (Clayton 4A). The complaints were based on the facts uncovered by the government in preparing its criminal indictments. On October 28, 1964, the government amended each of its five complaints by adding a new count under 15 U.S.C. § 4 seeking to restrain continuing violations by the defendants of Section 1 of the Sherman Act.

Some two years later, on December 8, 1967, with the consent of each defendant except American, a "Partial Final Judgment" was entered in each case, i. e., by December 8, 1967, all save American compromised and settled their cases with the United States. These "partial final judgments" enjoined each of the consenting defendants from engaging in enumerated violations of Sherman 1 for five years.

On May 24, 1968, a "Final Judgment" was entered against American—only— in each of the three government cases in which it had been named as a defendant. It is thus clear that although the judgments of December 8, 1967, were called "Partial Final Judgment", they were in fact final judgments as to all named defendants except American.

In 1961, a Clayton 7 divestiture action was brought by the Federal Trade Commission (FTC) against Martin-Marietta Corporation (Martin-Marietta), and on March 12, 1963, a consent decree was entered, ordering not only divestiture by Martin-Marietta of certain named concrete pipe and other plants within twenty-four months but also placing a ten-year restraint on Martin-Marietta against acquisition of similar plants.

On August 21, 1967, the cities of Phoenix, Mesa, Tucson, Tempe, Scottsdale and Flagstaff, and the towns of Goodyear and Showlow, all Arizona municipal corporations, filed a Sherman 1 and 2 violation complaint in the District of Arizona, similar to the one filed by the plaintiff herein, denominated a "class action", against American, American Concrete Pipe Co. (American Concrete),[2A] Kaiser, Smith-Scott, United, USI and U. S. Steel. The State of Arizona, through its Attorney General, as a subsequent intervening party plaintiff in that action, thereafter on September 20, 1968 entered into a covenant not to sue with defendants U. S. Steel, Kaiser and USI. Due to settlement negotiations, this Arizona "class action" never moved beyond the basic initial proceedings, and no rulings were made by this court on the class action aspect of the case and no intervention was made by any possible member of the "class", except the State of Arizona. The plaintiff here, Maricopa County, never moved to intervene in that action.

On April 19, 1969, plaintiff herein filed its complaint against all of the defendants named in the heading of this case except Arizona Concrete Pipe Co. (Arizona Concrete) and Six Points Lumber & Supply Co. (O'Malley). On

"and various other companies * * * not made defendants in this indictment, participated as co-conspirators in the offense charged." *E. g.*, Indictment, Cr. 33340 (S.D.Cal.).

2. Each complaint concerned itself with differing sizes of pressure and non-pressure steel and/or concrete pipe, but the charges of violations were all essentially identical.

2A. For the purpose of this decision, American and American Concrete are considered one and the same, and the term "American" as used hereafter applies to both.

May 22, 1969, plaintiff filed its First Amended Complaint against the same defendants named in the original complaint and added Arizona Concrete [2B] and O'Malley. The complaints charged all defendants with the same acts, as violating Sherman 1 and 2, as were delineated in both the government's criminal and civil actions.

## DEFENDANTS URGE NINE THEORIES

All defendant maintain (1) that since there was at least a four-day hiatus between the termination of the criminal actions by the government and the filing of government civil actions which did not toll the statute, therefore the tolling period, under § 5(b), within which the plaintiff was privileged to file its suit, terminated on June 18, 1965, i. e., one year after the termination of the criminal actions; and (2) since the plaintiff alleged that defendants' illegal conspiracies terminated some time in 1962, ergo, the last date upon which plaintiff could have filed, to have any possible cause of action within the four-year statutory period of limitations under Clayton 4B (15 U.S.C. § 15b), would be not later than the end of 1966.[3]

All defendants further maintain (3) that there can be no tacking of successive tolling periods on to that invoked by the government's criminal actions, so that even though the government on October 28, 1964, amended its complaint to add an injunctive count which would normally invoke the tolling provisions of § 5(b), neither can the possible tolling aspects raised by the government's amended complaints be related back under F.R.Civ.P. 15(c) to June 24, 1964, when the government's non-tolling complaints were initially filed, nor can the amended complaints have any tolling effect whatsoever. To do so, defendants argue, would be to tack on successive tolling periods. All defendants, save American, Martin-Marietta and O'Malley, also urge (4) that since final judgments were entered in the government civil action against them on December 8, 1967, the tolling provisions of § 5(b) in any event, ended on December 8, 1968, as to them. Martin-Marietta and O'Malley urge (5) that since they were never named as defendants or co-conspirators in any government action, civil or criminal in the "pipe" cases, neither the criminal nor the civil government actions had any tolling effect upon any cause of action now alleged against them, and since the plaintiff alleges the conspiracy terminated some time in 1962, the last date upon which plaintiff could have brought the present action was not later than the end of 1966. Martin-Marietta also maintains (6) that (a) the FTC action had no tolling effect as to it, inasmuch as the Clayton 7 action before the FTC was not based in whole or in part on any matter complained of in plaintiff's complaint and § 5(b) did not apply; and (b) even if it did, any possible tolling terminated one year after the entry of the FTC order on March 12, 1963. O'Malley also urges (7) that not only was it never an alleged co-conspirator or defendant in any government action but that also it had never been namd a defendant in any end-user complaint filed in Arizona or anywhere else, therefore the tolling provisions of § 5(b) had no application to it.

U. S. Steel, Kaiser and USI also maintain (8) that inasmuch as Maricopa County is a political subdivision of the State of Arizona, and the State, by its Attorney General, entered into a Covenant Not To Sue with them on September 20, 1968, the plaintiff, as such a political subdivision, is bound by that covenant and estopped to bring this present suit.

**2B.** Arizona Concrete had entered no appearance in this case when defendants' motions were argued on June 16, 1969.

**3.** Although in paragraph 23 of its First Amended Complaint plaintiff alleges that the defendants acted together to conceal the conspiracy and the acts performed in furtherance thereof, the complaint does *not* allege fraudulent concealment from the plaintiff as a basis upon which the statute might be tolled.

82

All parties maintain (9) that the doctrine of laches should be applied because of the late, late filing of the complaint.

APPLICABLE LAW

Of course, the primary problems before this court are (a) whether or not the tolling provision of § 5(b) remained in full force and effect past June 19, 1965, and if so, (b) whether it so continued as to all conspirators named in the government suit except American, after December 8, 1968.

■ It is settled that if a claim is brought after the running of the statute of limitations and such defect is apparent on the face of the complaint, it is tantamount to a failure to state a cause of action and such "defense" may be raised by a motion to dismiss, but since, as here, there are usually several tolling theories involved, necessitating that the motions be accompanied by reference to matters outside the pleadings, the usual practice is to include a motion for summary judgment together with that for dismissal.[4] These defendants' motions, then, are properly before the court.

■ Section 4B of the Clayton Act (15 U.S.C. § 15b) recites that suits under §§ 4 or 4A of that Act are "forever barred unless commenced within four years after the cause of action accrued." A cause of action under the Sherman Act accrues when the antitrust laws are violated, and there is a causally

related injury to business or property flowing from such violation.[5] A conspiracy of the nature here alleged is a continuing one and is in effect renewed during each day of its continuance.[6] When the cause of action is based on such an alleged unlawful conspiracy, the cause of action accrues and § 4B begins to run upon the occurrence of each overt act causing damage to the plaintiff.[7] Since the complaint here alleges that the conspiracy began "in and about 1954" and continued until some time in 1962 with the overt acts occurring prior to the end of 1962, and the complaint here was filed on April 15, 1969, on the face of the complaint therefore more than four years must have passed since any overt acts could have last occurred and plaintiff's claims are therefore barred by reason of the running of the four-year statute of limitations fixed by § 4B unless the statute in this case has been suspended or tolled.

■ Section 5(b) of the Clayton Act (15 U.S.C. § 16(b)),[8] suspends the running of the statute of limitations as to private claims during the pendency of any government civil or criminal antitrust action "based in whole or in part on any matter complained of in" a government proceeding "during the pendency thereof and for one year thereafter." With certainty, therefore, the government criminal indictments, *supra*, put into effect the § 5(b) suspension of the statute as to the defendants named in the

4. Suckow Borax Mines Consol., Inc. v. Borax Consolidated, 185 F.2d 196 (9 Cir. 1950).

5. Flintkote Co. v. Lysfjord, 246 F.2d 368 (9 Cir. 1957).

6. United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939); United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

7. *Suckow, supra* n. 4.

8. "Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not

including an action under section 15a of this title, the running of the statute of limitations in respect of every private right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: Provided, however, That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued."

indictments and kept alive plaintiff's privilege to sue for any of their overt, illegal acts causing injury to it within the four years prior to the return of the criminal indictments on March 10, 1964. The government's criminal actions were terminated on June 19, 1964, when judgments of conviction were entered therein and the one-year extension of the suspension thereupon started running.

■ The government's False Claims and Clayton 4A actions, as filed June 23, 1964, are expressly excluded from the tolling provisions of § 5(b). With equal certainty therefore, until the government amended its complaints on October 28, 1964, to add a claim for injunctive relief under 15 U.S.C. § 4, the pendency of those first government civil actions had no effect upon the ticking away of the one-year suspension period following June 19, 1964.

## DEFENDANTS' THEORIES 1, 2, 3

Defendants maintain that when the suspension provisions of § 5(b) were started up by the return of the indictments on March 10, 1964, no government civil or criminal action filed thereafter would have any effect upon the period of suspension established thereby, i. e., there could be no tacking of tolling periods simply because there might thereafter develop an overlap in government civil-criminal anti-trust proceedings. Defendants' position flows primarily from dicta in Dickinson, Inc. v. Kansas City Star Company, 173 F.Supp. 423 (W.D. Missouri 1959). *Dickinson* involved a private antitrust action filed after the government had "simultaneously commenced a criminal and a civil action against defendants for violation of Section 2 of the Sherman Act." (At 423.) The government criminal action terminated before the government's civil action ended, and the court rejected the defendants' argument that the § 5(b) suspension ended one year after the criminal action terminated. In holding that the plaintiff could take advantage of the *prima facie* effect of the criminal judgment (the basic question before the court being an evidentiary one), the court gratuitously stated that the result would be otherwise if the two government actions had been successively filed rather than contemporaneously brought:

> "The rule is, that 'successive disabilities may not be tacked to one another so as to bring a party within the exceptions to the statute of limitations.' 54 C.J.S. Limitations of Actions p. 254, § 219." 173 F.Supp. at 425.

Dickinson (at 424), relying on Sun Theatre Corp. v. RKO Radio Pictures, 213 F.2d 284, 290 (7 Cir. 1954), held that the evidentiary benefits of the first paragraph of Clayton § 5 (15 U.S.C. § 16), and the tolling provisions of the second paragraph are "complimentary", and must be construed together. Thus, the court's conclusatory dicta was not illogical—in 1959.

The *Dickinson* dicta was referred to in the excellent decision of Judge Larson in State of Michigan v. Morton Salt Company, 259 F.Supp. 35, 51 (D.Minn.1966):

> "It may be that in some instances tolling the statute during successive actions would result in treble damage claims of such vintage that it would be patently unreasonable to assume that Congress meant to allow 'tacking' under § 5(b). * * *

But Judge Larson thereafter watered down this postulation by continuing:

> "But here, the civil complaint was filed within two weeks of the indictment. Although not simultaneously commenced, the two actions were pending concurrently. I think this situation falls within permissible limits so that the suspension could continue until the conclusion of the civil suit."

Short of perfectly "concurrent" filings, this court fails to perceive any difference, in their tolling or tacking effect, between successive government antitrust proceedings, one of which may have been filed one minute, one hour, one day, one

week, or any period of time after another has been filed.[9]

The "complimentary" and togetherness construction given Clayton §§ 5(a) and 5(b), by *Sun Theatre* and *Dickinson* was discarded and overruled in Minnesota Mining & Manufacturing Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 317, 319, 85 S.Ct. 1473, 14 L.Ed.2d 405 (1965) (hereinafter cited as 3M), in holding that § 5(b) was completely severable from § 5(a), the court adding: "[T]extual distinctions as well as the policy basis of § 5(b) indicate that it was to serve a more comprehensive function in the congressional scheme of things." (At 319, 85 S.Ct. at 1477.)

Both *3M* and Leh v. General Petroleum Corporation, 382 U.S. 54, 86 S.Ct. 203, 15 L.Ed.2d 134 (1965), state and restate the principle that the scope of § 5(b) is not to be restrictively interpreted.[10] Although the legal concept of tacking successive periods of suspensions followed in Union Carbide & Carbon Corp. v. Nisley, 300 F.2d 561 (10 Cir. 1961), was not an issue in *Leh, Nisley* was approvingly cited therein. *3M* and *Leh* inferentially, but with certainty, overruled the legal logic and with it the conclusions of *Sun Theatre* and *Dickinson,* that absent "simultaneous" filing of government criminal and civil antitrust actions the "first in first out" rule on tolling would foreclose any possible overlapping or tacking of tolling emanating from a second and later filed government action.

As this court sees it, *Nisley, 3M* and *Leh* are dispositive of this problem (and most of the others now before the court). *Nisley* permitted "tacking" to enable two plaintiffs to bring an action in 1958 for overt acts occurring in 1938, violating the antitrust laws, by first giving full effect to the 1942 war-time tolling statutes, 56 Stat. 71, as amended 59 Stat. 306, 15 U.S.C. § 16, under which all statutes of limitations applicable to antitrust violations were suspended until June 30, 1946. Then, in June of 1946, the government filed an antitrust indictment against the defendants which was dismissed upon the filing by the government, in September 1948, of an antitrust criminal information against the same defendants which was not terminated until June 2, 1957. Plaintiffs filed their action within one year thereafter, relying upon § 5 of the Clayton Act. The Court of Appeals in *Nisley* analyzed in depth the rationale and scope intended by Congress to be given § 5(b) when it enacted the same (see 300 F.2d at 568–569), and while holding, on the authority of *Sun Theatre,* the two subsections to be complimentary and should therefore be construed together, decided that they were not "necessarily co-extensive in their frame of reference."[11] 300 F.2d at 569.

The Court in *3M* approved the reasoning of *Nisley* and stated:

"[T]he textual distinctions as well as the policy basis of § 5(b) indicate that it was to serve a more comprehensive function in the congressional scheme of things. The Government's initial action may aid the private litigant in a number of other ways. The pleadings, transcripts of testimony, exhibits and documents are available to him in most instances. * * * Moreover, difficult questions of law may be tested and definitively resolved before the private litigant enters the fray. The greater resources and expertise of the Commission and its staff render the private suitor a tremendous benefit aside from any value he may derive from a judgment or decree. Indeed so useful is this service that government

---

9. There's no such condition as being *only a little bit* pregnant.

10. 3M, *supra*, 381 U.S. at 319, 322, 85 S. Ct. 1473; Leh, *supra*, 382 U.S. at 56, 59, 86 S.Ct. 203.

11. On that rationale, the appellate court found that a government antitrust suit was pending (for the tolling purposes of § 5(b)) from the time in 1946 when the criminal indictment was filed until the termination of the suit on the information in 1957. Nisley, *supra*, 300 F.2d at 570.

proceedings are recognized as a major source of evidence for private parties." 381 U.S. at 319, 85 S.Ct. at 1478.

The Court in *Leh*, referring to *Nisley* and *3M*, reaffirmed the rationale of both, restating that it was Congress' " 'belief that private antitrust litigation is one of the surest weapons for effective enforcement of the antitrust laws.' 381 U.S., at 318, 85 S.Ct., at 1477",[12] and that the overriding purpose of the Clayton Act's tolling provision is to assist private litigants in utilizing any benefits they might cull from any government antitrust actions.

■ *3M* and *Leh* unequivocally indicate that the language of § 5(b) must be given its broadest application in favor of enabling private litigants to reap every benefit that they possibly can out of any governmental criminal or civil antitrust litigation during the pendency of each and within one year thereafter. Congress has seen fit to extend to private litigants the privilege of waiting until any government action has come to an end and then extend the suspension for an additional one year. This court cannot deny to the plaintiff the fullest use of that congressional privilege.

Defendants cite 54 C.J.S. Limitations of Actions § 219, p. 254, as supporting their contention that the suspension of the four-year statute of limitations terminated on June 19, 1965, and that the filing of the government civil actions *after* June 19, 1964, could not extend nor add to the one-year suspension created by the government's criminal actions. Even a superficial glance at § 219 indicates that the rule that "[s]uccessive disabilities may not be tacked to one another so as to bring a party within the exceptions to the statute of limitations" was intended to apply to several disabilities of the same person, e. g., disability of infancy tacked to disability of

coverture or insanity, etc. The case of Givens v. Jones, 158 Okl. 124, 12 P.2d 892, one of the cases cited in support of the rule, involved the problem of minority with subsequent mental incompetency after adulthood. The Oklahoma court correctly stated that the "party claiming the benefit of a disability can only avail himself of the existing disability when the right of action first accrues, *unless the statute provides otherwise.*" (Emphasis added.) 12 P.2d at 894. Not only is the matter now before the court not concerned with several disabilities of the same person, but also the congressional act, suspending the statute of limitations, specifically provides for the suspension during any period that *any* government action is pending and for one year thereafter.

■ This court recognizes the general rule that "statutes of limitations are statutes of repose and are favored by the courts",[13] and that the underlying purpose "is to force a litigant to get moving, * * * to pursue every avenue of relief promptly, while the evidence is fresh and the witnesses are available",[14] and that it was with this in mind, as well as for other reasons, that Congress fixed the statute of limitations in antitrust cases at four years. Having so fixed the statute of limitations, Congress could have stopped right there—but it didn't. Congress, with deliberation and specificity, disturbed that "repose" and overrode that purpose by enacting § 5(b), to make manifest that in encouraging the enforcement of the antitrust laws by private litigation, tolling of the statute was more important than the repose established thereby.

■ By § 5(b) Congress has said that so long as "*any* government proceedings" (emphasis added) were pending and for one year thereafter, antitrust claims were not stale and could be enforced.

---

12. Leh, 382 U.S. at 59, 86 S.Ct. at 207.

13. Hamrick v. Indianapolis Humane Society, Inc., 273 F.2d 7, 9 (7 Cir. 1959), *cert. den.* 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960).

14. Dedmon v. Falls Products Incorporated, 299 F.2d 173 (5 Cir. 1962).

In balancing the equities of plaintiff and defendant in repose and tolling, Congress deliberately weighted the law in favor of the private plaintiff and not the antitrust defendant. While the logic of the policy generally underlying a statute of limitations is to assure fairness to the defendants, who must bear the burden of suit, Congress made antitrust actions an exception to the general rule and instead made antitrust defendants fair game for the private plaintiff to shoot at for one year after the end of *any* government antitrust proceedings.

This court is not here faced with or considering the classical legal concept of tacking successive disabilities. The use of the term "tacking" in the context of § 5(b) is statutorily inapplicable if the congressional policy so definitively stated in *3M* and *Leh* is to be given the broad use and effect desired by Congress. Here, this court can be and is only concerned with the implementation of that congressional policy of giving every opportunity to private plaintiffs to enforce the antitrust laws. It was upon this last broad concept that *3M* extended § 5(b) to include not only governmental criminal actions and civil actions stemming from the same facts upon which criminal charges were based, but also to FTC actions, if private antitrust litigation thereafter undertaken was based in whole or in part on any matter complained of in *any* such government antitrust proceedings.[15]

Congress made no distinction between government civil or criminal antitrust proceedings nor cared when either was filed. Any such governmental proceeding stands on its own legislative foundation and carries its own severable tolling provisions with it. If the periods of the government actions happen to overlap, the end of one tolling period following the termination of a government action does not in any wise disturb or curtail the free flowing river of suspension created by and welling from the filing of any government antitrust proceedings. Private antitrust litigation may be filed at any time prior to one year after the termination of *any* criminal or civil proceedings, whenever the same may have been filed, concurrently or successively. As indicated, if two or more periods of tolling happen to overlap, as is here the case, then since the statutory tolling period has never become moribund nor buried, the tolling provisions continue to be viable until the end of the one-year extension following the termination of the last government action to end.

One caveat, however, is illustrated by the present case. Presupposing that before that one year period of suspension following the termination of criminal actions had ended, i. e., June 19, 1965, the government had filed its same False Claims and § 4A actions (as was here done), and *after* June 19, 1965, the government had then amended its civil actions to add an antitrust injunctive count, this court would have no hesitancy in stating that the insertion of the injunctive antitrust count by amendment would not revive any claims already made moribund by the termination of the one-year extension. "What is dead, is dead", and an attempted heart transplant by the relation-back theory on amendments under F.R.Civ.P. 15(c) would not revive the cause of action.[16] That, however, is not the situation here.[17] The one-year suspension period following June 19, 1964, had *not* ended, when on October 28, 1964, the government amended its complaint to file the injunctive count, so this court is not called upon to decide the effect of F.R.Civ.P. 15(c) on an already demised cause of action.

15. Excepting, of course, 15 U.S.C. § 15a actions.

16. *Cf.* Nisley, 300 F.2d at 571, Salyers v. United States, 257 F. 255 (8 Cir. 1919); Standard Oil Co. v. Perkins, 396 F.2d 809 (9 Cir. 1967), rev'd on other grounds, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed. 2d 599 (1969).

17. If the government filed a new action under 15 U.S.C. § 4 after the one year had expired, the result, of course, would be the same.

## DEFENDANTS' THEORY 4

 Inasmuch as the government's antitrust injunctive count was filed within one year from the date of the end of the government's criminal actions, the period of suspension of the four-year limitation period never died but continued on to the advantage of any laggardly plaintiff for not only one year after December 6, 1967, when final judgments were filed as to all defendants named in the government's civil actions save American, but also continued its tolling effect until one year after final judgment in the case involving American.

There is no question but that by this holding, defendants U. S. Steel, Kaiser, United, Smith-Scott and USI are badly hurt because of the failure of American to settle out with the government at the same time in 1967 that they did. Unfortunately for them however, by their prior conspiratorial actions they had become solidly chained to American until all government cases were terminated and were, willy-nilly, dragged along into their present predicament by the stubborn refusal of American to conclude its case with the government when they did. Since plaintiff's action is based almost wholly upon the same conspiratorial acts alleged by the government in both its criminal and civil actions, the statute of limitations thus remained tolled as to all defendants named in the government actions until one year after the government's civil case against American had terminated, viz., until May 24, 1969. The plaintiff, having filed its action against those defendants on April 15, 1969, therefore gains the fullest advantage of the tolling provisions of § 5(b), in the optimum implementation of the congressional policy as interpreted in *3M* and *Leh*.

## DEFENDANTS' THEORIES 5 and 7

 Martin-Marietta and O'Malley, however, were not defendants in the gov-

ernment suit nor were they named as co-conspirators. A comparison of the allegations in plaintiff's complaint, here, with the government complaints, makes it manifest, however, that the alleged conspiratorial acts of these two defendants were entwined with and fundamentally the same as those of the defendants named in the government actions; with certainty, plaintiff's claims against them are "based in whole or in part" on the violations alleged in the government actions. 15 U.S.C. § 16(b). Prior to *Leh*, in the Ninth Circuit, this similarity probably would *not* have been sufficient to toll the statute as to them. Steiner v. 20th Century-Fox Film Corp., 232 F.2d 190 (9 Cir. 1956), demanded that under § 5(b) a " 'greater similarity is needed than that the same conspiracies are alleged. The same means must be used to achieve the same objectives of the same conspiracies by the same defendants.' 232 F.2d, at 196." [18] The Supreme Court, in *Leh*, overruled *Steiner*. The Court of Appeals, in *Leh*,[19] in following *Steiner*, had concluded that the running of the statute of limitations was not suspended because "there were not only different overt acts charged, but different conspiracies, occurring at different times, between different parties." [20] The Supreme Court, in *Leh*, however, held that the "private plaintiff is not required to allege that the same means were used to achieve the same objectives of the same conspiracies by the *same defendants* (emphasis added). Rather, effect must be given to the broad terms of the statute itself—'based *in whole or in part* on *any matter* complained of'" (italicized in original), and continued: "[T]he courts must not allow a legitimate concern that invocation of § 5(b) be made in good faith to lead them into a niggardly construction of the statutory language * * *." [21]

If more were needed, the Supreme Court, in *Leh*, referred back to *3M* and found that the difference in parties did

---

18. 382 U.S. at 57, 86 S.Ct. at 206.

19. 330 F.2d 288 (9 Cir. 1964).

20. *Id.* at 301.

21. 382 U.S. at 59, 86 S.Ct. at 207.

not prevent a tolling of limitations as to *3M*, since the private plaintiff's Sherman Act claims set up substantially the same claims as were presented by the government in the Clayton Act proceedings before the FTC. The Court concluded:

> "Just as in *Minnesota Mining* the differences between Sherman Act and Clayton Act proceedings were held not to require the conclusion that the private action under the Sherman Act was not based in part on any matter complained of in the Government's § 7 suit, so here we cannot conclude that a private claimant may invoke § 5(b) only if the conspiracy of which he complains has the same breadth and scope in time and participants as the conspiracy described in the government action on which he relies. Here there is substantial identity of parties, six of the seven defendants in this case being defendants in the government suit as well. In suits of this kind, the absence of complete identity of defendants may be explained on several grounds unrelated to the question of whether the private claimant's suit is based on matters of which the Government complained. In the interim between the filing of the two actions it may have become apparent that a party named as a defendant by the Government was in fact not a party to the antitrust violation alleged. Or the private plaintiff may prefer to limit his suit to the defendants named by the Government whose activities contributed most directly to the injury of which he complains. On the other hand, some of the conspirators whose activities injured the private claimant may have been too low in the conspiracy to be selected as named defendants or co-conspirators in the Government's necessarily broader net." [22]

So here, the two defendants, Martin-Marietta and O'Malley, though never mentioned in the government actions, nevertheless are also caught by the gills with the other alleged co-conspirators who became entangled in the government's net.[23]

## DEFENDANTS' THEORY 8

■■■ The covenant not to sue executed by the State of Arizona in favor of U. S. Steel, Kaiser and USI purported to bind the State of Arizona, its departments, agencies and entities, to refrain from suing the three corporations for any antitrust "pipe" claims it might have against them and any overt acts of the three defendants prior to June 20, 1968. It is noted that the State actually intervened as a party plaintiff in the action brought by the cities of Phoenix, Mesa, Tempe, etc., and the towns of Goodyear and Showlow.[24] Thus the State certainly purported to be an entity separate from the cities and towns within it. Under Arizona Revised Statutes § 11–202 each county in Arizona is a body politic and corporate, and by A.R.S. § 11–532 a county's attorney is given the authority to sue on behalf of that county. A.R.S. § 41–192 gives the State Attorney General of Arizona the power to coordinate the legal services required of other departments of the State or other State agencies. This last power apparently gives to the Attorney General the power to bring actions on behalf of the counties only when the county specifically requests the Attorney General to so represent it.

Plaintiff's Exhibit 2 shows that the State Attorney General at no time represented Maricopa County in the Phoenix, et al., case, nor was he ever requested to so represent Maricopa County. The State of Arizona did not intervene in the City of Phoenix case as a party in a class. The State of Arizona's covenant not to sue had no relationship to nor effect on the present action brought by Maricopa County.[25]

---

22. *Id.* at 63–64, 86 S.Ct. at 209.

23. See also Morton Salt, *supra*, 259 F. Supp. at 53–55.

24. U. S. Steel Exhibit G, p. 406.

25. Defendants U. S. Steel, Kaiser and Martin-Marietta have raised the issue that because this court set a cutoff date for intervention in some seven class ac-

## DEFENDANTS' THEORY 9

█ All defendants maintain that in any event plaintiff's cause of action is barred by laches. It was laches which apparently concerned Judge Larson in *Morton Salt* when he said:

"It may be that in some instances tolling the statute during successive actions would result in treble damage claims of such vintage that it would be patently unreasonable to assume that Congress meant to allow 'tacking' under § 5(b)." 259 F.Supp. at 51.

Assuming arguendo that laches might be a defense to an action at law,[26] nevertheless, Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 214 (9 Cir. 1962), on laches in general, and *Nisley* as laches particularly applies to antitrust actions, hold that federally created statutes of limitation are not to be curtailed or cut short. The congressional intent that there must be preserved to the private litigant every possible benefit he can glean from any antitrust laws is the underlying and ever present factor in our decision-making process.[27]

█ Moreover, the equitable doctrine of laches is addressed to the discretion of the trial court to be determined by the particular circumstances of the case then before the court, the crucial consideration being whether there has been such a lapse of time as would do an injustice to the defendants if plaintiff's action were permitted to stand.[28] While the claims of the plaintiff involved purchases of pipe made by it prior to the end of 1962, it is not now urged by any of the defendants that they have no records of sales dating that far back.

To the contrary, this court would take judicial notice of the fact that the records of sales transactions of the several defendants here have been produced, dating as far back as 1954, in the actions of the almost 400 plaintiffs filed in the various districts of the Ninth Circuit between 1964 and 1969, upon all of which cases this judge has sat. The circumstances of the alleged conspiracies, the documents and parties involved, have been developed in depth, and documents and depositions of the alleged conspiring parties are still readily available to each and every defendant. The lapse of time, in this case, in no wise affects the defendants ability to respond to the plaintiff's complaint.

The defense of laches is here unavailable to the defendants.

## DEFENDANTS' THEORY 6

This court's disposition of the statute of limitations problems as the same affect Martin-Marietta, makes it unnecessary for this court to pass upon plaintiff's allegations that the FTC proceedings, based on a violation of Clayton 7, filed January 27, 1961, followed by a consent order of that Commission on March 12, 1963, suspends the running of the statute of limitations against Martin-Marietta in this case, because the order of divestiture gave Martin-Marietta 24 months to dispose of certain plants and enjoined certain acts by Martin-Marietta for a period of 10 years.[29] As indicated by this court during oral argument, however, the FTC action is inapplicable. Not only were the alleged monopolistic acts of Martin-Marietta in the FTC's Clayton 7 complaint not even in part

tions filed in the states of Hawaii, Washington, Oregon and California, and such actions were subsequently settled, therefore the failure of plaintiff herein to have intervened therein before that cutoff date, in some manner forecloses it from bringing the present action. The several class actions involved in the 1965 cutoff order of this court, on the face of each complaint affected thereby, limited the parties of the class to the public agencies in each of the above several states. The plaintiff here was never officially notified of the

pendency of those class actions, nor did it join in the same.

26. *Cf.* Shultz v. Manufacturers & Traders Trust Co., 40 F.Supp. 675 (W.D.N.Y. 1941).

27. Cf. also United States v. Manufacturers Hanover Trust, 229 F.Supp. 544, 546 (S.D.N.Y.1964).

28. Refrigerated Transport Co. v. United States, 297 F.Supp 5, 7 (N.D.Ga.1969).

29. *Cf. 3M* and *Leh, supra; Sun Theatre, supra,* 213 F.2d at 292.

concerned with any of defendants' acts in violation of Sherman 1 and 2 as here alleged by plaintiff, but also the FTC order of divestiture and injunction, on March 12, 1963, terminated that proceeding for the purpose of § 5(b), even though a few implementary housekeeping chores were continued thereafter.

Defendants' motions to dismiss or for summary judgment are denied.