PERKINS *v.* STANDARD OIL CO. OF CALIFORNIA.

No. 624.   Argued April 22–23, 1969.—Decided June 16, 1969.

Earl W. Kintner and George R. Kucik argued the cause for petitioner. With them on the briefs were Thomas L. Siegel, Roger Tilbury, Ernest Bonyhadi, and Bruce M. Hall.

Richard J. MacLaury argued the cause for respondent. With him on the brief were Francis R. Kirkham and H. Helmut Loring.

MR. JUSTICE BLACK delivered the opinion of the Court.

In 1959 petitioner, Clyde A. Perkins, brought this civil antitrust action against the Standard Oil Company of California seeking treble damages under § 2 of the Clayton Act, as amended by the Robinson-Patman Act,[1] for injuries alleged to have resulted from Standard's price discriminations in the sale of gasoline and oil during a period of over two years from 1955 to 1957. In 1963, after

---

[1] Section 2 of the Clayton Act, 38 Stat. 730, as amended, 49 Stat. 1526, 15 U. S. C. § 13, provides in pertinent part as follows:

"(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ."

a lengthy and complicated trial, the jury returned a verdict for Perkins and assessed damages against Standard of $333,404.57, which, after trebling by the court and after the addition of attorney's fees, resulted in a total judgment against Standard of $1,298,213.71. On review, the Court of Appeals for the Ninth Circuit held that the assessment of damages included injuries to Perkins that were not recoverable under the Act and therefore ordered a new trial. *Standard Oil Co. of California* v. *Perkins*, 396 F. 2d 809. We granted certiorari to determine whether the Court of Appeals, in reversing the judgment, had correctly construed the Robinson-Patman Act.

Petitioner Perkins entered the oil and gasoline business in 1928 as the operator of a single service station in the State of Washington. By the mid-1950's he had become one of the largest independent distributors of gasoline and oil in both Washington and Oregon. He was both a wholesaler, operating storage plants and trucking equipment, and a retailer through his own Perkins stations. From 1945 until 1957, Perkins purchased substantially all of his gasoline requirements from Standard. From 1955 to 1957 Standard charged Perkins a higher price for its gasoline and oil than Standard charged to its own Branded Dealers,[2] who competed with Perkins, and to Signal Oil & Gas Co., a wholesaler whose gas eventually reached the pumps of a major competitor of Perkins. Perkins contends that Standard's price and price-related discriminations against him seriously harmed his competitive position and forced him, in 1957, to sacrifice by sale what remained of his once independent business to

[2] Branded Dealers were independent operators of Standard's Signal and Chevron stations who marketed gasoline and oil under Standard's brand names. During the claim period the Signal Branded Dealers had no connection with Signal Oil & Gas Co., which is involved in this litigation as a wholesaler.

one of the major companies in the gasoline business, Union Oil.

Many of the elements of liability on the part of Standard are not in dispute. Standard has admitted that it sold gasoline and oil to its Branded Dealers and to Signal Oil at discriminatorily lower prices than those at which it sold to Perkins. The Court of Appeals found that Standard's liability for the harm done Perkins by the favorable treatment of the Branded Dealers was beyond dispute. Of this aspect of the damages, the Court of Appeals said:

> "The Branded Dealers purchased gasoline and oil from Standard which they in turn sold at retail. With respect to them, Perkins' story is quickly told. Because of Standard's favoritism and discrimination they were able to and did offer lower prices and better services and facilities than Perkins in marketing at retail." 396 F. 2d, at 812.

With regard to Perkins' damage resulting from Standard's discrimination in favor of Signal Oil, however, the Court of Appeals took a different view because of the following circumstances under which the discriminatory sales were made. Standard admittedly sold gasoline to Signal at a lower price than it sold to Perkins. Signal sold this Standard gasoline to Western Hyway, which in turn sold the Standard gasoline to Regal Stations Co., Perkins' competitor. Perkins alleged that the lower price charged Signal by Standard was passed on to Signal's subsidiary Western Hyway, and then to Western's subsidiary, Regal. Regal's stations were thus able to undersell Perkins' stations and, according to Perkins, the resulting competitive harm, along with that he suffered at the hands of Standard's favored Branded Dealers, destroyed his ability to compete and eventually forced him to sell what was left of his business. The Court of

Appeals held, however, that any harm suffered by Perkins from impaired competition with Regal stations was beyond the scope of the Robinson-Patman Act because Regal was too far removed from Standard in the chain of distribution. A substantial part of the damages the jury assessed against Standard, as the Court of Appeals viewed it, might have been based upon a finding that Perkins suffered competitive harm from the price advantage held by Regal stations. That court, concluding that "the whole verdict is tainted, since the amount reflected in it by Regal's conduct cannot be ascertained, . . ." reversed the judgment and ordered a new trial. 396 F. 2d, at 813.

We disagree with the Court of Appeals' conclusion that § 2 of the Clayton Act, as amended by the Robinson-Patman Act, does not apply to the damages suffered by Perkins as a result of the price advantage granted by Standard to Signal, then by Signal to Western, then by Western to Regal. The Act, in pertinent part, provides:

> "(a) It shall be unlawful for any person engaged in commerce, . . . either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ."

The Court of Appeals read this language as limiting "the distributing levels on which a supplier's price discrimination will be recognized as potentially injurious to competition." 396 F. 2d, at 812. According to that court, the coverage of the Act is restricted to injuries caused by an impairment of competition with (1) the seller

("any person who . . . grants . . . such discrimination"), (2) the favored purchaser ("any person who . . . knowingly receives the benefit of such discrimination"), and (3) customers of the discriminating seller or favored purchaser ("customers of either of them"). Here, Perkins' injuries resulted in part from impaired competition with a customer (Regal) of a customer (Western Hyway) of the favored purchaser (Signal). The Court of Appeals termed these injuries "fourth level" and held that they were not protected by the Robinson-Patman Act. We conclude that this limitation is wholly an artificial one and is completely unwarranted by the language or purpose of the Act.

In *FTC* v. *Fred Meyer, Inc.,* 390 U. S. 341 (1968), we held that a retailer who buys through a wholesaler could be considered a "customer" of the original supplier within the meaning of § 2 (d) of the Clayton Act, as amended by the Robinson-Patman Act, a section dealing with discrimination in promotional allowances which is closely analogous to § 2 (a) involved in this case. In *Meyer,* the Court stated that to read "customer" narrowly would be wholly untenable when viewed in light of the purposes of the Robinson-Patman Act. Similarly, to read "customer" more narrowly in this section than we did in the section involved in *Meyer* would allow price discriminators to avoid the sanctions of the Act by the simple expedient of adding an additional link to the distribution chain. Here, for example, Standard supplied gasoline and oil to Signal. Signal, allegedly because it furnished Standard with part of its vital supply of crude petroleum, was able to insist upon a discriminatorily lower price. Had Signal then sold its gas directly to the Regal stations, giving Regal stations a competitive advantage, there would be no question, even under the decision of the Court of Appeals in this case, that a clear violation of the Robinson-Patman Act had been committed. Instead of selling directly to the re-

tailer Regal, however, Signal transferred the gasoline first to its subsidiary, Western Hyway, which in turn supplied the Regal stations. Signal owned 60% of the stock of Western Hyway; Western in turn owned 55% of the stock of the Regal stations. We find no basis in the language or purpose of the Act for immunizing Standard's price discriminations simply because the product in question passed through an additional formal exchange before reaching the level of Perkins' actual competitor. From Perkins' point of view, the competitive harm done him by Standard is certainly no less because of the presence of an additional link in this particular distribution chain from the producer to the retailer. Here Standard discriminated in price between Perkins and Signal, and there was evidence from which the jury could conclude that Perkins was harmed competitively when Signal's price advantage was passed on to Perkins' retail competitor Regal. These facts are sufficient to give rise to recoverable damages under the Robinson-Patman Act.

Before an injured party can recover damages under the Act, he must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered. This is true regardless of the "level" in the chain of distribution on which the injury occurs. The court below held that, as a matter of law, "Section 2 (a) of the Act does not recognize a causal connection, essential to liability, between a supplier's price discrimination and the trade practices of a customer as far removed on the distributive ladder as Regal was from Standard." 396 F. 2d, at 816. As we have noted above, we do not accept such an artificial limitation. If there is sufficient evidence in the record to support an inference of causation, the ultimate conclusion as to what that evidence proves is for the jury. *Continental Co.* v. *Union Carbide,* 370 U. S. 690, 700–701 (1962). Here the trial judge properly charged the jury that Perkins had the burden of showing that any damage to his business

was proximately caused by Standard's price discriminations and there was substantial evidence from which the jury could infer causation. There was evidence that Signal received a lower price from Standard than did Perkins, that this price advantage was passed on, at least in part, to Regal, and that Regal was thereby able to undercut Perkins' price on gasoline. Furthermore, there was evidence that Perkins repeatedly complained to Standard officials that the discriminatory price advantage given Signal was being passed down to Regal and evidence that Standard officials were aware that Perkins' business was in danger of being destroyed by Standard's discriminatory practices. This evidence is sufficient to sustain the jury's award of damages under the Robinson-Patman Act.

One other minor group of damages was found to be improper by the Court of Appeals and we conclude that this ruling was also erroneous. Perkins submitted some evidence tending to show that he as an individual had suffered financial losses because the two failing Perkins corporations (Perkins of Washington and Perkins of Oregon) were unable to pay him agreed brokerage fees for securing gasoline, rental on leases of service stations, and other indebtedness. The Court of Appeals, in order to give guidance to the trial judge at the proposed new trial, noted that, in its opinion, these damages were not proximately caused by Standard's violations and that Perkins should not recover for these damages in a second trial. For this proposition the Court of Appeals cited *Karseal Corp.* v. *Richfield Oil Corp.*, 221 F. 2d 358, 363, which held that "the rule is that one who is only *incidentally* injured by a violation of the antitrust laws,— the bystander who was hit but not aimed at,—cannot recover against the violator." It is clear in this case, however, that Perkins was no mere innocent bystander; he was the principal victim of the price discrimination practiced by Standard. Since he was directly injured

and was clearly entitled to bring this suit, he was entitled to present evidence of all of his losses to the jury. Moreover, it is obvious from the opinion of the Court of Appeals that this question was being decided, not because there was any reversible error at the first trial, but in order to give guidance for the conduct of any new trial. The record in this case does not show that the jury included an award for any of these minor items in its judgment. It is impossible to say that they were included because they were not covered in the trial judge's charge to the jury. While the trial judge treated many items of damage specifically, there was no charge—either specific or general—upon which the jury could have felt free to include such items in its award. For this reason, the Court of Appeals could not have reversed the jury's verdict in this case on this ground.

Respondent has argued in its brief several minor trial rulings which it contends were in error. Most of these additional arguments were rejected by the Court of Appeals. We have examined the others and find them without merit. We therefore see no need to prolong this litigation which began nearly 10 years ago. The jury's verdict and judgment should be reinstated.

*It is so ordered.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE STEWART joins, concurring in part and dissenting in part.

I agree with the Court that the judgment of the Court of Appeals cannot be affirmed. But I cannot agree either with the broad, and somewhat vague, ground of decision chosen by the Court or with the conclusion that the jury verdict in this case must be reinstated.

As I view it, this case poses only a very narrow question. Respondent discriminated in price in favor of

Signal Oil & Gas Co. Through a chain of majority-owned subsidiaries, Signal marketed this gasoline at stations which competed with petitioner's outlets. Since we are dealing with a chain of majority-owned subsidiaries, it seems quite likely that the discriminatory price given Signal would have a vital effect on the pricing decisions of the stations which eventually marketed Signal's gasoline. Even if the lower price were not passed on to the company marketing the gasoline, that company would be more willing to accept losses in a protracted price war if it knew that its "grandfather" corporation were making some extra, and partially offsetting, profits. For this reason, and since in interpreting the antitrust laws "[w]e must look at the economic reality of the relevant transactions," *United States* v. *Concentrated Phosphate Export Assn., Inc.,* 393 U. S. 199, 208 (1968), I would treat Signal, the beneficiary of the discriminatory price, as if it were directly competing with petitioner's stations. Respondent's price discrimination, on this view, in effect injured competition with a company which "knowingly receive[d] the benefit of such discrimination," Clayton Act § 2 (a), 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13 (a), and the case could properly go to the jury for determination of "causation" and damages. Accordingly, I see no reason to intimate, even by indirection, what the result would be if wholly independent firms had intervened in the distribution chain. I would therefore explicitly limit the holding to the facts of the case before us.

Moreover, I see no reason for the Court to undertake the difficult task of sorting out all the other issues in this case. The Court of Appeals based its reversal solely on its view of the "fourth line injury" problem. Other issues were treated on the assumption that the case would have to go back for trial. The record in this case is long and complicated and we have no idea what

view the Court of Appeals would have taken about respondent's other allegations of error had the major prop for its decision been removed. The law under the Robinson-Patman Act is convoluted enough without the addition of numerous explicit and implicit holdings which may come back to bedevil us in future years. I would leave these other problems unresolved so that the Court of Appeals can look at them anew in the context of this Court's holding on the major issue of general importance presented by the petition for certiorari.