481 F.Supp. 399 (1979)
INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION, Plaintiff,
v.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Western Electric Company, Inc., and Bell Telephone Laboratories, Inc., Defendants.
No. 77 Civ. 2854 (GLG).
United States District Court, S. D. New York.
November 26, 1979.
*400 Howard J. Aibel, Edwin A. Kilburn, Robert E. McKee, New York City, Blecher, Collins & Hoecker, Los Angeles, Cal., LeBoeuf, Lamb, Leiby & MacRae, New York City, for plaintiff; Maxwell M. Blecher, Daphne Stegman, Los Angeles, Cal., Edwin A. Kilburn, Grant S. Lewis, Jay G. Safer, John S. Kinzey, Jr., New York City, of counsel.
Dewey, Ballantine, Bushby, Palmer & Wood, New York City, George L. Saunders, Jr., Chicago, Ill., Harold S. Levy, John S. Luckstone, New York City, for defendants; F. Mark Garlinghouse, George V. Cook, New York City, William L. Keefauver, Murray Hill, N. J., of counsel.

OPINION
GOETTEL, District Judge:
This is another round in the heavyweight antitrust contest between International Telephone and Telegraph Corporation ("ITT") and American Telephone and Telegraph Company ("AT&T").[1] In the main action, ITT has alleged that AT&T violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, in the manufacture, distribution, and sale of telecommunications equipment. This round concerns AT&T's counterclaim that ITT, in its provision of telecommunications services and equipment, violated section 1 of the Sherman Act. As to that counterclaim, ITT has moved for summary judgment under Fed.R.Civ.P. 56.
The parties are both giant corporations. AT&T, which is by far the largest telephone company in the United States, provides telephones and telephone services, either directly or indirectly, to most Americans. Among its subsidiaries are twenty-three Bell operating companies, which are local suppliers of telephone services to consumers throughout the nation, and Western Electric, which manufactures telephone equipment. ITT is a multinational conglomerate corporation involved in a wide variety of businesses, including telecommunications equipment and services.[2] An ITT subsidiary, United States Transmission Service ("USTS"), provides private long-line telephone service of the same type as is provided by the Long Lines Department of AT&T, although on a much smaller scale. This private long-line service and the provision of switching and transmission equipment used in conjunction with it are the subjects of AT&T's counterclaim.
In its counterclaim, AT&T asserts that ITT combined and conspired with others "to restrain trade in telecommunications services and equipment" (1) by acquiring firms having significant communications requirements "with the intent and purpose of using the communications requirements of its affiliated corporations as a base for entering various aspects of the telecommunications business," and (2) by causing those firms to purchase telecommunications services and equipment from ITT or its subsidiaries. *401 AT&T contends that it has suffered losses of customers and revenues as a result of ITT's alleged illegal activities. In practical terms, AT&T claims that ITT acquired such firms as a hotel company and an insurance company in order to obtain a captive market in private long-line equipment and services for ITT subsidiaries.[3] AT&T was allegedly injured because the Bell operating companies were deprived of the opportunity of leasing such equipment and providing long-line services to firms that had bought similar equipment and services from ITT subsidiaries and because AT&T's Long Lines Department was deprived of the opportunity of providing certain services to those firms.
ITT has moved for summary judgment on AT&T's counterclaim on three grounds. First, ITT asserts that its alleged activity foreclosed no more than a de minimis share of the market and thus could not have effected an unreasonable restraint of trade. Second, ITT asserts that AT&T lacks standing to sue for alleged injuries to Bell operating companies as a result of ITT's activity. Third, ITT asserts that AT&T's counterclaim is contingent on the Court's ruling against AT&T on the issue of whether governmental regulation of telecommunications services removes such services from the reach of the antitrust laws  an issue that ITT asserts the Court will not be called on to consider.[4]
The general rule that summary judgment should be used sparingly in antitrust cases, see Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), does not mean that summary judgment should never be used in such cases. Awarding of summary judgment in antitrust cases in which there was no genuine issue of material fact has found approval in the Supreme Court, see, e. g., First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), and in this circuit, see, e. g., Modern Home Institute, Inc. v. Hartford Accident and Indemnity Co., 513 F.2d 102 (2d Cir. 1975). Summary judgment has been approved in "rule of reason" cases, see, e. g., V. & L. Cicione, Inc. v. C. Schmidt & Sons, Inc., 403 F.Supp. 643 (E.D.Pa.1975), aff'd, 565 F.2d 154 (3d Cir. 1977), as well as in per se violation cases. See, e. g., Modern Home Institute, supra.
On a motion for summary judgment, the moving party must "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party opposing the motion, however, "may not rest upon the mere allegations or denials of his pleading," but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In opposing the motion for summary judgment, AT&T argues that there is a factual dispute on the definition of the relevant market to be used for determining the degree of foreclosure. AT&T, however, has offered no specific facts showing that the relevant market is other than that proposed by ITT and has not even suggested a possible alternative market or submarket. In support of its motion, ITT has offered figures from AT&T's answers to interrogatories concerning AT&T's total telecommunications revenues and its revenue losses resulting from ITT's activities. The hope that additional discovery[5] might enable AT&T to propose different figures is not *402 adequate justification for denying the motion for summary judgment at this time.
AT&T alleges in its counterclaim that ITT's acquisitions of prospective purchasers of telecommunications services and equipment foreclosed a portion of the market. Such vertical foreclosure is not a per se violation of the Sherman Act, but rather is to be judged under the "rule of reason." Crucial to a determination of whether the alleged vertical foreclosure is an unreasonable restraint of trade is an assessment of the percentage of the market foreclosed. In response to ITT's Interrogatories Nos. 2 and 4, AT&T identified telecommunications services and equipment as the product and service impacted by ITT's alleged violation of section 1 of the Sherman Act and identified the relevant market as the "world-wide telecommunications services and equipment market," but declined to state the size of that market. ITT submits that the size of the relevant market is at least as large as AT&T's sales in that market, since the total relevant market would include AT&T's sales plus the sales of any other participants in that market. ITT has determined from AT&T's figures that AT&T's sales in telecommunications services and equipment amounted to $35,165,000,000 in 1977, the latest year for which figures were available. AT&T, which is the giant in the field and should be better able than anyone else to suggest a relevant market, offers no alternative figures or market definition. For the share of the market foreclosed, ITT again submits figures from AT&T's answer to Interrogatory No. 2: the revenues AT&T claims to have lost in 1977 as a result of ITT's activities were $24,485,000. Thus, the portion of the market foreclosed to AT&T, represented by AT&T's lost revenues, was no more than .07%.[6]
For purposes of analysis, however, the figures for AT&T's lost revenues must be subdivided into those revenues lost by AT&T itself and those lost by the Bell operating companies. Most of ITT's telecommunications business is in the manufacture and sale of equipment. In that part of its business, ITT competes directly with Western Electric, the Bell System's equipment manufacturer, and indirectly with the Bell operating companies, who buy telecommunications equipment from Western Electric and then lease it to subscribers.
ITT's only telecommunications service business is that provided by USTS. Since AT&T's business is only in the area of service, the competition between AT&T and USTS is the only direct competition between AT&T and ITT or its subsidiaries. The revenues AT&T lost to USTS as a result of USTS sales of services to ITT-affiliated companies in 1977 were $64,900, or .00546%[7] of the private lines revenues of AT&T's Long Lines Department[8] in that *403 year. AT&T sustained the remainder of the lost revenues only in its capacity as a licensor and stockholder of Bell operating companies: AT&T has license contracts with the Bell operating companies under which it provides certain services and receives a percentage of the companies' earnings; of the twenty-three Bell operating companies, AT&T wholly owns seventeen, owns a majority of the stock of four others, and owns a minority of the stock of the remaining two companies.
ITT argues that AT&T lacks standing to assert its counterclaim for the portion of the injury that it suffered as a licensor or stockholder of the Bell operating companies. According to the law of this circuit, a claimant must have suffered direct injury as a result of the alleged violation, see Long Island Lighting Co. v. Standard Oil Co. of Calif., 521 F.2d 1269, 1274 (2d Cir. 1975), cert. denied, 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 83 (1976), and must have been in the "target area" of the alleged conspiracy in restraint of trade. Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292 (2d Cir. 1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). Among those whose injuries have been deemed too remote for a treble damages claim under the antitrust statutes are stockholders, see Bookout v. Schine Chain Theatres, Inc., 253 F.2d 292 (2d Cir. 1958); licensors, see Productive Inventions, Inc. v. Trico Products Corp., 224 F.2d 678 (2d Cir. 1955), cert. denied, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956); and franchisors, see Billy Baxter, Inc. v. Coca-Cola Co., 431 F.2d 183 (2d Cir. 1970), cert. denied, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). Accordingly, under the Second Circuit rule,[9] AT&T may not assert its claim for the portion of its losses it suffered in the capacity of stockholder, licensor, or franchisor of Bell operating companies.
Only the telecommunications services revenues at issue here do not run afoul of the standing barrier. This portion of AT&T's claim must, therefore, be considered on the merits. The first step in considering whether the foreclosure of a portion of the market is an unreasonable restraint of trade is to compare the size of the market foreclosed with the size of the total market. As is noted above, the telecommunications service revenues AT&T claims to have lost as a result of ITT's sale of services (through USTS) to the affiliated companies ITT acquired, allegedly for the purpose of foreclosing that portion of the market, amounted to $64,900, or .00546% of the market, in 1977. By any standard, that share of the market is de minimis. Even if AT&T were not barred by the standing requirement from asserting the remainder of its alleged losses, the entire share of the market foreclosed  .07% at the highest point, in 1977  would still be very small.
*404 In the leading vertical foreclosure case under section 1 of the Sherman Act, the Supreme Court found that foreclosure of 3% of the market for rolled steel was not an unreasonable restraint of trade. See United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). In a recent case, Magnus Petroleum Co. v. Skelly Oil Co., 599 F.2d 196 (7th Cir. 1979), the Seventh Circuit, reversing the lower court's finding of a section 1 violation, held that a foreclosure of approximately 1% of the relevant market was de minimis and thus reasonable under the Sherman Act. Id. at 204.
Under section 7 of the Clayton Act, 15 U.S.C. § 18, some courts have found vertical foreclosures of as little as 1% or 2% to be unreasonable restraints of trade. See, e. g., Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Section 7 of the Clayton Act, however, was intended to reach restraints on trade in their incipiency, before they have risen to the level of Sherman Act violations; thus, section 7 has been interpreted to proscribe a broader range of conduct than that forbidden by the Sherman Act. The Supreme Court explained that "the legislative history of § 7 indicates clearly that the tests for measuring the legality of any particular economic arrangement under the Clayton Act are to be less stringent than those used in applying the Sherman Act." Brown Shoe, 370 U.S. at 328-29, 82 S.Ct. at 1526. Since the market foreclosure in this case does not even approach the level required under the Clayton Act, it is clearly de minimis under the more stringent standard of the Sherman Act.
AT&T argues that an examination of the market share foreclosed is not the only relevant inquiry in determining the reasonableness of the restraint of trade and that the presence of other conditions in the market can affect the assessment of reasonableness. An inquiry into other market conditions is called for, however, only when the share of the market foreclosed is more than minimal. The Supreme Court stated in Brown Shoe:
If the share of the market foreclosed is so large that it approaches monopoly proportions, the Clayton Act will, of course, have been violated; but the arrangement will also have run afoul of the Sherman Act. . . . On the other hand, foreclosure of a de minimis share of the market will not tend "substantially to lessen competition."
Between these extremes, in cases such as the one before us, in which the foreclosure is neither of monopoly nor de minimis proportions, the percentage of the market foreclosed by the vertical arrangement cannot itself be decisive. In such cases, it becomes necessary to undertake an examination of various economic and historical factors in order to determine whether the arrangement under review is of the type Congress sought to proscribe.
370 U.S. at 328-29, 82 S.Ct. at 1526 (footnotes omitted).
Under no reading of the facts now before the Court can the market foreclosure in this case rise above the de minimis level, since AT&T has standing to claim treble damages only for its losses of service revenues. In opposing the motion for summary judgment, AT&T has not suggested how facts that might be revealed in further discovery would show more than a minimal foreclosure.
There is the additional question of whether government regulation removes the private long-line service from the reach of the antitrust laws. As noted earlier, AT&T attempts to defend the main action on the ground that its entire business is exempt from the antitrust laws. See note 4 supra. AT&T asserts the counterclaim only contingentlythat is, only if the Court rules against it on this ground. ITT asserts that the Court will never reach the issue.
Without extensive consideration of the issue, it would seem that the telecommunications equipment aspect of both parties' business is not subject to direct government regulation and, consequently, AT&T's defense in the main action may fail. The private long-lines business, however, may be sufficiently regulated to exempt it from *405 the antitrust laws. Papers before the Court do not establish the extent of the regulation of private long lines. Consequently, although government regulation might ultimately provide an additional defense as to the only aspect of the counterclaim as to which AT&T has standing, we do not have enough information to decide the issue at the present time.
For the reasons stated, ITT's motion for summary judgment on AT&T's counterclaim is granted.
SO ORDERED.
NOTES
[1] For an account of Round 1, see International Tel. and Tel. Corp. v. American Tel. and Tel. Co., 444 F.Supp. 1148 (S.D.N.Y.1978).
[2] Although ITT's telecommunications business is large ($4,660,000,000 in 1977), it does not approach AT&T's size in that field. See note 6 infra and accompanying text.
[3] The hotel company was Sheraton Hotels, and the insurance company was Hartford Insurance Company. Although it seems implausible that ITT would acquire such huge companies for the purpose of obtaining their telecommunications business, the Court will assume, for purposes of this motion, that ITT had such a motive.
[4] Paradoxically, AT&T claims, for purposes of the main action, that governmental regulation exempts the telecommunications business from the antitrust laws, but, for purposes of the counterclaim, takes the position that the telecommunications business is subject to the antitrust laws. See the discussion of ITT's third argument infra.
[5] This case was initiated two and one-half years ago, the counterclaim was made on August 5, 1977, and extensive discovery has already taken place, both on the main case and on the counterclaim.
[6] The market foreclosures in other years were even smaller than in 1977, as the figures below show.

Year AT&T Revenues* AT&T Sales Percentage
 Lost to ITT Diverted
1973 $ 22,697,000,000 $ 5,145,000 .023%
1974 25,274,000,000 7,767,000 .031%
1975 27,953,000,000 11,562,000 .041%
1976 31,674,000,000 15,288,000 .048%
1977 35,165,000,000 24,285,000 .070%
TOTAL 142,783,000,000 64,247,000 .045%
* AT&T's revenue figures in its answer to Interrogatory No.
2 omitted the last three zeroes. AT&T's annual reports,
however, make clear that the figures should be in the
billions rather than millions.

[7] The revenues diverted for 1976, the first year in which USTS operated, were even smaller, as the figures below show.

Year AT&T Private AT&T Sales Percentage
 Lines Revenues* Lost to USTS Diverted
1976 $1,127,793,000 $ 4,408 .00039%
1977 1,188,133,000 64,900 .00546%
TOTAL 2,315,926,000 69,308 .00299%
* AT&T Private Lines is part of AT&T's Long Lines Department,
whose total revenues were $12,584,482,000 for 1976
and $14,100,668,000 for 1977. If the total department
figures were used rather than the Private Lines portion
only, of course, the percentage diverted would be even
smaller  .00003% for 1976 and .00025% for 1977.

[8] As noted above, AT&T identified the relevant market as the world-wide telecommunications services and equipment market, and ITT does not dispute that identification. Even if a smaller market, such as private long-lines services, were identified, however, the market foreclosure would still be very small. In order to present the case of AT&T, the party opposing the motion, in the most favorable light, the Court has used only AT&T's private long-lines revenues rather than AT&T's total revenues in determining the percentage foreclosed by USTS. See note 7 supra. Again, the Court has assumed that the size of the relevant market is at least as large as AT&T's share of that market, since the total market would include AT&T's sales plus the sales of any other participants in that market.
[9] AT&T argues that the Supreme Court's holding on a minor issue in Perkins v. Standard Oil Co., 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), vitiates the Second Circuit's rule. The Supreme Court held that Perkins was entitled to present evidence of losses he suffered because two failing corporations were unable to pay him fees and rentals. Id. at 649-50, 89 S.Ct. at 1875. The Supreme Court, however, could not have meant to overturn the standing rule established in the Second Circuit, since two years after Perkins, the Court cited with approval Billy Baxter, supra, and several other cases that concluded "that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." Hawaii v. Standard Oil Co., 405 U.S. 251, 263 n. 14, 92 S.Ct. 885, 891-892 n. 14, 31 L.Ed.2d 184 (1972).

Recent Supreme Court decisions limiting the class of plaintiffs who can sue for treble damages also appear to strengthen the position of the Second Circuit's standing cases. See Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) (barring use of the pass-on theory by indirect purchasers to win treble damages in a price-fixing case); Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (limiting the type of injury for which a plaintiff can claim treble damages to injury of the type the antitrust laws were intended to prevent).