In re **MUNICIPAL BOND REPORTING ANTITRUST LITIGATION.**

**JOHN H. DEGOLYER COMPANY, INC., et al., Plaintiffs-Appellants,**

v.

**STANDARD & POOR'S CORPORATION, et al., Defendants-Appellees.**

No. 80–2012.

United States Court of Appeals,
Fifth Circuit.

April 5, 1982.

Marion J. Craig, III, Earnest Langley, Hereford, Tex., Alioto & Alioto, Joseph M. Alioto, San Francisco, Cal., for plaintiffs-appellants.

Marshall M. Searcy, Jr., Dallas, Tex., for defendants-appellees.

Before POLITZ and RANDALL, Circuit Judges, and PARKER *, District Judge.

POLITZ, Circuit Judge:

In April, 1976, John J. DeGolyer Company, Inc. and John H. DeGolyer, filed this antitrust suit alleging that McGraw-Hill Publishing Company, Standard & Poor's Corporation, The Blue List Publishing Company, Inc., and Brenton W. Harries, conspired to force them out of a profitable business.[1] Following entry of a transfer order,[2] the matter was consolidated under 28 U.S.C. § 1407 with two other actions.[3] After four years of discovery, the defendants moved for summary judgment. In due course, a hearing was held and the motion was granted. The plaintiffs appeal contending that they have standing to assert a

cause of action under section 4 of the Clayton Act, and that genuine issues of fact exist which preclude entry of summary judgment. Finding no error, we affirm.

John H. DeGolyer is the sole shareholder in John J. DeGolyer, Inc., which was engaged in the trading of municipal and corporate securities prior to March of 1973, when it terminated business. From 1969 to 1971, John DeGolyer developed computerized systems designed for use in the securities trading market. With this background, in July of 1971 DeGolyer entered into negotiations with Investment Information Inc. (III), looking toward the creation of an entity to market information in a manner attractive to the municipal bond industry. As a consequence, in December of 1971 the DeGolyer company and III executed an agreement which envisioned the start-up of Investment Information Bond Service, Inc. (IIBS), a corporation designed to develop and sell access to computerized information on either a "hard" or "soft" dollar basis.[4] The agreement provided III with ownership of 80% of the prospective IIBS shares, with the remainder being held by the DeGolyer company.

According to John DeGolyer, after the December 1971 agreement neither he nor his company developed or marketed a computerized data processing system applicable to the bond market. The record shows that III personnel developed computer programs to enhance the attractiveness of IIBS.

---

* Chief Judge of the Middle District of Louisiana, sitting by designation.

1. Section 4 of the Clayton Act, 15 U.S.C. § 15, which forms the principal basis of the plaintiffs' complaint, reads:

    Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

2. The original complaint was instituted in the Northern District Court of California. Pursu-

ant to 28 U.S.C. § 1404(a), the case was transferred to the Southern District of New York.

3. Consolidated with *Munitrad, Inc. v. Standard & Poor's Corp.*, CA–3–75–0942–C, and *Munitrad, Inc. v. Harries*, CA–3–76–1290–C, the suit was sent to the Northern District of Texas.

4. "Hard" dollar transactions required the consumer to pay subscription fees for the computerized data service. "Soft" dollar transactions did not entail a cash outlay. Instead, if implemented under the "soft" dollar arrangement, the IIBS customer would direct municipal securities business to the DeGolyer company which would subscribe to the system, thus paying the customer's fees, and be awarded credit against subscription as a form of commission.

Notwithstanding, from December 1971 to March 1972, IIBS did not receive a single subscription. Without revenues, losses accumulated in excess of a quarter of a million dollars.

In light of this financial track record, the shareholders, including the DeGolyer company, voted unanimously to dissolve IIBS; in October of 1972, the corporation's assets were liquidated. Three and one-half years later, the plaintiffs filed the instant suit accusing the defendants of monopolizing or restraining trade.

### Standing to Sue

The question whether the plaintiffs have standing to sue is a threshold consideration. The defendants maintain that John DeGolyer and his corporation are outside of the "target area" of the alleged antitrust violations and assert only speculative damages which "ripple" from the purported unlawful conduct.

Standing to sue under section 4 of the Clayton Act is a legal inquiry. "The question of standing is a preliminary one, to be answered from examination of the allegations of the complaint." *In re Beef Indus. Antitrust Litigation*, 600 F.2d 1148, 1168 (5th Cir.), *other claims addressed*, 607 F.2d 167 (5th Cir. 1979), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980) (*citing Yoder Bros., Inc. v. California-Florida Plant Corp.*, 537 F.2d 1347 (5th Cir.

1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977)). To meet the crucial standing threshold, the plaintiffs must demonstrate "that they suffered injury to their 'commercial interests or enterprises' *and* that they were in the target area of the conspiracy." *Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172, 1176 (5th Cir. 1976) (emphasis added). With these standards in mind, we have examined the plaintiffs' complaint as well as the evidence adduced in connection with the motion for summary judgment. Our conclusion is that plaintiffs lack the requisite standing to sue.

The plaintiffs assert an entirely speculative derivative injury.[5] Neither John DeGolyer nor his company have demonstrated standing to sue under section 4 by virtue of a "ripple effect" injury resulting from lost future profits from the "soft" dollar arrangement with IIBS.

While DeGolyer argues that his corporation was injured in a manner other than by the demise of IIBS, the evidence developed from nearly four years of discovery does not bear this out. If a conspiracy proscribed by the antitrust laws existed, the target was IIBS, not the plaintiffs. Not everyone "arguably injured by an antitrust violation may bring suit. Even though an individual may suffer a pocketbook injury, he must be the 'target' of anti-competitive practice before he may sue."[6] *Pan-Islamic*

---

**5.** Paragraph 43 of the plaintiffs' complaint states that they

were not only in the target area of the conspiracy, but were the parties directly aimed at as well, as they were in the respective businesses above set forth [municipal securities information distribution], and were the reasonably foreseeable target. The threatened sector of the economy was the matter of advertising through computer municipal securities in a more efficient way and manner. The Plaintiffs were injured in the loss of commissions on sale of securities.

Even assuming that these bare allegations confer standing, the plaintiffs' complaint also alleges in paragraph 23:

Plaintiffs would show the Court that they [sic] systems developed by Plaintiffs were profitable and would have been successful *through the structure of IIBS* for the benefit of Plaintiffs had it not been for the conspiracies and conduct and furtherance thereof by

these Defendants and with others not at this point named herein.
(Emphasis added.)

Paragraph 23 alleges a derivative injury to the plaintiffs. In sum, the complaint and the supporting evidence contain, "at best, allegations under which the plaintiffs could show harm flowing derivatively from a reduction in consumer demand." *In re Beef Antitrust Litigation*, 600 F.2d at 1168. Such accusations are not sufficient to meet the standing bar to suits under section 4 of the Clayton Act. *See Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539 (5th Cir. 1980); *Universal Brands, Inc. v. Phillip Morris, Inc.*, 546 F.2d 30 (5th Cir. 1977); *Jeffrey v. Southwestern Bell*, 518 F.2d 1129 (5th Cir. 1975).

**6.** "In simple terms a 'target' is a person or business against which competitive aim is taken. The line is clearly drawn by requiring that

Trade Corp. v. Exxon Corp., 632 F.2d 539, 546 (5th Cir. 1980) (citation omitted). See Perkins v. Standard Oil Co., 395 U.S. 642, 649, 89 S.Ct. 1871, 1875, 23 L.Ed.2d 599 (1969) (" 'one who is only *incidentally* injured by a violation of the antitrust laws,— the bystander who was hit but not aimed at,—cannot recover against the violator.' ") (*quoting Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 363 (9th Cir. 1955) (emphasis in original)); *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342 (5th Cir. 1980), *cert. denied*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981). DeGolyer complains of the loss of commissions anticipated from the "soft dollar" arrangement with III.[7] The demise of IIBS aborted this anticipation. Whatever injury the plaintiffs may have sustained, their claims are entirely speculative and are not redressable under the antitrust laws. The plaintiffs are without standing to sue under section 4 of the Clayton Act.

### Summary Disposition

To the extent that the plaintiffs sought relief under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, the trial court correctly rendered summary judgment in favor of the defendants. The plaintiffs failed to raise a genuine factual dispute of a material issue under section 1. See *Scranton Constr. Co., Inc. v. Litton Indus. Leasing Corp.*, 494 F.2d 778 (5th Cir. 1974). See also *Blackburn v. Crum & Forster*, 611 F.2d 102 (5th Cir.), *cert. denied*, 447 U.S. 906, 100 S.Ct. 2989, 64 L.Ed.2d 856 (1980); *Panotex Pipe Line Co. v. Phillips Petroleum Co.*, 457 F.2d 1279 (5th Cir.), *cert. denied*, 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 86 (1972). For a discussion of the propriety of the use of the summary judgment procedure, and the lack of evidence presented indicating a triable issue of fact under section 2 of the Sherman

Act, *see* our opinion, issued this date, in the consolidated case of *Munitrad Systems, Inc. v. Standard & Poor's Corp.*, —— F.2d —— (5th Cir. 1982). Finally, with regard to the plaintiffs' Clayton Act claim, summary disposition in favor of the defendants was proper, for the foregoing reasons.

The judgment of the district court is AFFIRMED.

---

to have standing one must be an object of an antitrust conspiracy." *Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1296 n.2 (2d Cir. 1971). If an antitrust violation occurred in this case, IIBS was the target of the combination. And merely because DeGolyer Company is a shareholder in IIBS does not grant it standing to sue under section 4 of the Clayton Act. *See Mendenhall*

*v. The Fleming Co., Inc.*, 504 F.2d 879 (5th Cir. 1974).

7. This claim is made notwithstanding the reality that III's staff, not DeGolyer's, prepared the computer programs to furnish bond information and despite the economic fact that IIBS never obtained a subscription for its service.