**Hugh COLLINS, et al., Plaintiffs,**

v.

**INTERNATIONAL DAIRY QUEEN, et al., Defendants.**

**No. 5:94CV95–4–MAC(WDO).**

United States District Court, M.D. Georgia, Macon Division.

Aug. 4, 1999.

Order Clarifying Opinion, Aug. 5, 1999.

**1306**

William Camp Harris, John Elvis James, Lisa Neill–Beckmann, Macon, Diane Green Smith, Lee Abrams, Chicago, IL, for plaintiffs.

Emmet J. Bondurant, II, Atlanta, Benjamin M. Garland, F. Kennedy Hall, Macon, William L. Killion, Quentin R. Wittrock, Minneapolis, MN, for defendants.

### ORDER

OWENS, District Judge.

Defendants International Dairy Queen, Inc. ("IDQ") and American Dairy Queen Corporation ("ADQ") have moved for summary judgment based on the ruling of the Supreme Court in *Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), that indirect purchasers are without standing to sue for damages under § 4 of the Clayton Act,[1] 15 U.S.C. § 15.[2] Plaintiffs have sued for damages under § 4 and have alleged that defendants have violated § 2 of the Sherman Act, 15 U.S.C. § 2, by monopolizing and attempting to monopolize a relevant market consisting of all products sold to Dairy Queen franchises located in the United States (outside of Texas), the sources of which products have to be ap-

proved by IDQ. Plaintiffs contend that defendants' motion should be denied under the "control" exception to *Illinois Brick*, based on evidence that ordinary market forces have been disrupted by defendants' control of the allegedly independent warehouses from which franchisees must buy food and supplies.

The motion presently before the court applies to items used in the operation of the Dairy Queen franchises, which the franchisees purchase from independent warehouses approved by defendants. Specifically excluded from the subject of this motion are those products that defendants sell directly to the franchisees.

In *Illinois Brick* the State of Illinois, along with 700 local governmental entities, brought an antitrust treble-damages claim under § 4 of the Clayton Act against concrete block manufacturers that they alleged were guilty of price-fixing. 431 U.S. at 726–27, 97 S.Ct. 2061. The State and the local municipalities were indirect purchasers of the concrete block, which was sold by the manufacturers to masonry contractors, used to construct buildings, then sold to Illinois and the municipalities. *Id.* Plaintiffs claimed that they had overpaid more than $3 million for the concrete blocks as a result of the overcharge being passed from the manufacturers through the contractors and subcontractors. *Id.* at 727, 97 S.Ct. 2061.

The Supreme Court held that as indirect purchasers of the concrete block, the State could not sue for antitrust damages. *Id.* at 736, 97 S.Ct. 2061. The ruling was the logical result of the Court's earlier holding in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). In *Hanover Shoe*

---

1. Section 4 of the Clayton Act provides:
   Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and

the cost of suit, including a reasonable attorney's fee.

2. The court has previously denied defendants' motion for summary judgment on the monopolization and attempted monopolization claims based on the issue of market definition. *See Collins v. International Dairy Queen, Inc.*, 980 F.Supp. 1252 (M.D.Ga.1997).

a shoe manufacturer brought an action under § 4 of the Clayton Act against a manufacturer of shoe machinery. The machinery manufacturer defended on the theory that any overcharge had been passed on to the customers of the shoe manufacturer; thus, the shoe manufacturer had not been damaged in its business. The Supreme Court rejected this defense, holding that only the overcharged direct purchaser, not others to whom an overcharge may have been passed in the chain of manufacture or distribution, is the party "injured in his business or property" within the meaning of § 4. *See Illinois Brick,* 431 U.S. at 729, 97 S.Ct. 2061. The Court declined to rule that indirect purchasers had suffered antitrust injury, regardless of any overcharge they may actually have paid at some point in the chain of manufacture or distribution.

Notwithstanding the holding in *Hanover Shoe,* the plaintiffs in *Illinois Brick* attempted to use a similar pass-on theory offensively, rather than defensively. The Supreme Court explained that its prohibition in *Hanover Shoe* against defensive use of a pass-on theory of recovery mandated a similar prohibition against offensive use of the theory. The Court explained that allowing the theory to be used offensively but not defensively would create a risk of multiple liability for defendants, because a direct purchaser could recover the full amount of a passed-on overcharge that an indirect purchaser had already recovered for, and vice versa. Permitting offensive but not defensive use of the theory would also increase the possibility of inconsistent adjudications and multiple liability for the defendant. *Illinois Brick,* 431 U.S. at 730–31, 97 S.Ct. 2061. The Court was also concerned with difficulties in apportionment of damages, *id.* at 737, 97 S.Ct. 2061, and with there being lesser incentives for private antitrust enforcement, *id.* at 745–46, 97 S.Ct. 2061.

The only exception the Court had contemplated to its ruling in *Hanover Shoe* was a situation in which there was a pre-existing cost-plus contract which could have the effect of circumventing complex market interactions. There is no claim in the present case of the existence of pre-existing cost-plus contract between IDQ/ADQ and any approved warehouse. However, *Illinois Brick* added a second possible exception in which a pass-on theory might be permitted: cases where the direct purchaser is owned or controlled by its customer. The Court described this as one in which market forces such as supply and demand would be superseded. *Id.* at 736 & n. 16, 97 S.Ct. 2061, citing *Perkins v. Standard Oil Co.,* 395 U.S. 642, 648, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), and *In re Western Liquid Asphalt Cases,* 487 F.2d 191 (9th Cir.1973), *cert. denied,* 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974).

The Supreme Court reaffirmed its *Illinois Brick* reasoning in *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), and in *Kansas v. UtiliCorp,* 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990). In *UtiliCorp* the Court again considered the issue of whether an indirect purchaser could sue for antitrust injury. In that case Utilicorp sued the pipeline company from which it had purchased natural gas for its own use and for resale. *Id.* at 204, 110 S.Ct. 2807. The States of Kansas and Missouri filed separate antitrust actions under § 4 against the pipeline company, and the actions were consolidated. The states asserted claims on behalf of all persons residing therein, as well as on behalf of state agencies, municipalities, and other political subdivisions that had purchased gas at inflated prices. *Id.* at 204–05, 110 S.Ct. 2807.

The pipeline company argued that the utility companies lacked standing because they had passed on 100 percent of the overcharges to their customers and had therefore suffered no antitrust injury. *Id.* at 205, 110 S.Ct. 2807. The district court relied on *Hanover Shoe* and *Illinois Brick* in granting a motion for partial summary judgment and dismissing the states' parens patriae action. The Court of Appeals agreed with this result, and the Supreme

Court affirmed, holding that only the utility had a cause of action under § 4 because it alone, as the direct purchaser, had suffered antitrust injury. *UtiliCorp*, 497 U.S. at 204, 110 S.Ct. 2807. The Court declined to create an exception to the *Illinois Brick* rule for customers of regulated public utilities, noting that the difficulties of apportionment, risk of multiple recovery, and lesser incentives for private antitrust enforcement cited therein and in *Hanover Shoe* were still applicable even if they applied with less force with respect to public utilities. *UtiliCorp*, 497 U.S. at 208, 110 S.Ct. 2807. The Court noted its continuing disinclination, which it had alluded to in *Illinois Brick*, to create further exceptions for particular types of markets. *UtiliCorp*, 497 U.S. at 216, 110 S.Ct. 2807.

Despite some initial arguments from defendants that the continuing validity of exceptions to *Illinois Brick* have been called into question by *UtiliCorp*, it is beyond question that the control exception remains viable. *See, e.g., Lowell v. American Cyanamid Co.*, 177 F.3d 1228 n. 2 (11th Cir.1999); *Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1212 n. 2 (9th Cir.1984); *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 968 n. 22 (3d Cir.1983); *Jewish Hosp. Assn. v. Stewart Mechanical Enterprises, Inc.*, 628 F.2d 971, 975 (6th Cir.1980). *See also In re Beef Industry Antitrust Litig.*, 600 F.2d 1148, 1162 (5th Cir.1979) (*Illinois Brick* found inapplicable to particular fact situation). Thus, plaintiffs as indirect purchasers from defendants of food and supplies, may be able to sue for antitrust injury under § 4 if they can show that defendants exercised sufficient control over the independent authorized warehouses so that ordinary market forces were superseded and the prices plaintiffs paid failed to reflect "the ordinary interaction of supply and demand." *Illinois Brick*, 431 U.S. at 736 & n. 16, 97 S.Ct. 2061.

Plaintiffs argue that there is a genuine issue of material fact as to whether defendants' relationship with the warehouses amounts to a degree of control sufficient to meet the *Illinois Brick* exception. In the present case plaintiffs/franchisees are required to buy only products approved by IDQ/ADQ, which are stocked by the approved independent warehouses. In many cases the warehouses are the only sources of the products since IDQ will not sell its products to other warehouses. Many authorized warehouses will charge franchisees a higher markup on all the franchisees' purchases if franchisees buy even one product from another warehouse. Franchisees are precluded from buying directly from manufacturers because the manufacturers will not sell directly to franchisees at comparable prices. In practice most of the franchises can buy essential products only from one warehouse because defendants' Authorized Warehouse Agreement allows a warehouse to sell only to those particular franchisees listed in the agreement unless the warehouse gives defendants 30 days' prior written notice. Thus, plaintiffs argue that there is no effective competition among warehouses, giving each warehouse a "hunting license" in the geographical area it serves.

Further, plaintiffs state that authorized warehouses are discouraged from stocking products endorsed by the Dairy Queen Operators Cooperative("DQOC")[3]. The warehouses are reluctant to stock duplicative inventories of both IDQ products and DQOC-endorsed products because of the enormous space already taken up by IDQ products. Some authorized warehouses have indicated that they see DQOC as a competitor and have discussed with defendants possible methods of keeping DQOC from being successful. Plaintiffs show that some warehouses have provided confidential information about DQOC pricing to IDQ so that IDQ could match or lower its

---

**3.** The Dairy Queen Operators' Cooperative ("DQOC") is a Minnesota corporation organized as a purchasing cooperative for Dairy Queen franchisees and store owners. Also,

the Dairy Queen Operators' Association ("DQOA") is a Minnesota corporation that is an association of Dairy Queen franchisees.

price, on some occasions even pricing products below cost. This type of information in some cases has been provided to defendants in spite of a warehouse's agreement with DQOA not to share this confidential information. In some cases the information on pricing and/or sales volume of DQOC-endorsed suppliers was requested by IDQ/ADQ.

In this regard plaintiffs point to a meeting held on July 21, 1992, between Michael Sullivan and Michael Leary, on behalf of defendants, and senior executives of IDQ-authorized warehouses with large volumes of business from defendants. Those in attendance at this meeting discussed concerns about DQOC's entering the market for approved products. Suggestions were made by warehouse executives that IDQ slow down the approval process and use warehouses to help keep manufacturers out of DQOA. Information comparing sales of DQOC-endorsed products with sales of IDQ/ADQ products was also likely shared at the meeting.

Plaintiffs emphasize the fact that IDQ/ADQ provide large amounts of credit for multiple products purchased by the authorized warehouses. Further, Michael Sullivan, president and CEO of defendants, has acknowledged that defendants are able through contract to control and put checks and balances on warehouses, in the context of preventing a particular warehouse company from gaining control of a significant portion of IDQ/ADQ/s business. There is evidence to suggest that some authorized warehouses have declined to carry DQOC products without IDQ's approval for fear of offending IDQ because of money that was owed. Plaintiffs contend that a warehouse's reluctance or unwillingness to sue IDQ for overcharges is compounded by the fact that each warehouse agreement is for only a one-year term, with defendants having the right to terminate the agreement without cause. Many of the authorized warehouses derive most of their business from Dairy Queen and would understandably be reluctant to take any action they would calculate as likely to lead to IDQ/ADQ's disapproval.

IDQ/ADQ's warehouse agreements not only provide that the warehouse's interest in the agreement itself cannot be transferred without IDQ's prior written consent, but also require IDQ's consent before any part of the company owning the warehouse may be sold. Defendants have the right to audit the warehouses' books at any time. Moreover, each warehouse is required to collect royalties and advertising payments on behalf of defendants and to hold this money in trust for defendants. In addition, plaintiffs show that at least one IDQ Board member, Richard Giersten, previously owned an IDQ-authorized warehouse which he sold to Nebco/Evans in 1991, remaining as a consultant to Nebco/Evans (later Ameriserve) until May 31, 1998. He was also on IDQ/ADQ's Board of Directors from March 1993 until January 1998.

Plaintiffs offer most of the above evidence in an attempt to demonstrate that ordinary market forces have been superseded by the arrangement between defendants and the authorized warehouses, and that the warehouses are so dependent upon and have such a close business connection with defendants that they would be reluctant to initiate an action for antitrust violations. Plaintiffs compare the relationship between defendants and the warehouses to that existing in *In re Western Liquid Asphalt Cases*, 487 F.2d 191 (9th Cir.1973). In that case consumers sued for damages for allegedly price-fixed liquid asphalt they had purchased through contractors, who passed the overcharge through to the consumers. The Ninth Circuit held that under the facts before the court *Hanover Shoe's* prohibition against the defensive use of a pass-on theory of recovery did not prevent the theory from being used offensively, and that the problem of apportioning damages was not insurmountable. The court held that:

It is understandable that contractors might not sue, in view of (1) their alleged dependence upon appellees for their supply of asphalt, (2) the possibility

that they earned a percentage profit on the overcharges, and (3) the control and interdependence alleged between appellees and the contractors. Thus, if the present appellants could establish antitrust violations but were precluded from recovering, no one else would sue, and appellees would retain their assumedly illegal profits.

*Id.* at 198.

However, the Ninth Circuit's reasoning was squarely rejected in *Illinois Brick,* the Supreme Court holding:

> We recognize that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers [citing *In re Western Liquid Asphalt Cases,* 487 F.2d at 198]. But on balance, and until there are clear directions from Congress to the contrary, we conclude that the legislative purpose in creating a group of " 'private attorneys general' " to enforce the antitrust laws under § 4 [citation omitted], is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it.

*Illinois Brick,* 431 U.S. at 746, 97 S.Ct. 2061. Thus, plaintiffs' reliance on *Liquid Asphalt Cases* for the proposition that the warehouses' presumed reluctance to sue IDQ/ADQ qualifies them for the control exception is misplaced.

The most compelling evidence to support a finding that defendants exerted some degree of control over the authorized warehouses is IDQ/ADQ's extension of large amounts of credit to the warehouses. Whether this circumstances qualifies plaintiffs for the control exception is best analyzed by reference to *Illinois Brick* itself. There, at 431 U.S. at 736 n. 16, 97 S.Ct. 2061, the Supreme Court cited *Perkins v. Standard Oil Co.,* 395 U.S. 642, 648, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), and

*Western Liquid Asphalt Cases,* as examples of potential situations where an indirect purchaser might not be barred from bringing suit because of the exertion of control between an indirect purchaser and a direct purchaser.

The *Illinois Brick* court's intended scope of the control exception was discussed in *Jewish Hospital Ass'n v. Stewart Mechanical Enterprises, Inc.,* 628 F.2d 971 (6th Cir.1980). The Sixth Circuit ruled that by citing *Perkins*[4] and *Western Liquid Asphalt* the Court had shown its intention that the control exception be "limited to relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale." *Jewish Hospital,* 628 F.2d at 975. *See also Fisher v. Wattles,* 639 F.Supp. 7 (M.D.Pa.1985)(holding, by reference to *Perkins,* that *Illinois Brick* contemplated some element of corporate control to meet the control exception). The Third Circuit stated, in *Mid–West Paper Prods. Co. v. Continental Group, Inc.,* 596 F.2d 573 (3d Cir.1979), that a parent and subsidiary will be regarded as one entity "when the parent dominates and controls the subsidiary to such an extent that the subsidiary is deemed to be an agent of the parent." *Id.* at 589. In *In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599 (7th Cir.1997), the Seventh Circuit found the control exception to be inapplicable because "the manufacturers do not control the wholesalers through interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, trust agreements, or other modes of control separate from ownership of a majority of the wholesalers' common stock." *Id.* at 605–06.

In the instant case, we find insufficient evidence that the extension of credit to

---

4. In *Perkins* the defendant had a 60–percent-owned subsidiary through which it routed an illegal discount. The Supreme Court held

that defendant could not avoid liability under the Robinson–Patman Act in this manner.

defendants' authorized warehouses resulted in subjecting the warehouses to the operating control of IDQ/ADQ. This court is mindful of the Supreme Court's reluctance in *Illinois Brick,* as further exemplified in *Blue Shield of Virginia v. McCready* and *Kansas v. UtiliCorp,* to limit any exceptions to the indirect purchaser rule. Consequently, we are reluctant to hold in this case that the extension of credit in itself is sufficient to entitle an indirect purchaser to utilize the control exception, at least without more specific evidence that defendants exercised control of the overall operations of the warehouses. We must further conclude that the warehouses' collection of royalties on behalf of defendants, as well as defendants' reservation of the right to audit the warehouses' books and to approve any sale of the company owning the warehouses, fall short of establishing a sufficient degree of control to establish a "functional economic unity" between defendants and the warehouse.

Finally, the fact that concerns were expressed between defendants' officers and representatives of independent warehouses about the encroachment of DQOA/DQOC does not refute the facts that IDQ does not own stock in the independent warehouses and that each warehouse establishes its own prices for products it resells to the franchisees. Moreover, plaintiffs have not shown that defendants prevent the warehouses from carrying competing DQOA products, it having been shown that some warehouses in fact carry DQOA products. Consequently, based on the evidence as a whole, the court must hold that the rule in *Illinois Brick* prevents plaintiffs, to the extent that they are indirect purchasers of goods from defendants' warehouses, from litigating their monopolization and attempted monopolization claims against defendants.

Defendants' motion for summary judgment based on *Illinois Brick v. Illinois* is therefore **GRANTED.**

## CLARIFICATION OF AUGUST 4, 1999 ORDER

Plaintiffs have requested clarification of the order of August 4, 1999, granting defendants' motion for summary judgment under the rule in *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), as to the monopolization and attempted monopolization claims brought under § 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs seek confirmation that the order does not prevent them from pursuing their monopolization and attempted monopolization claims for injunctive relief, as well as their damage claims with respect to products they purchased directly from IDQ or ADQ.

The August 4, 1999, order recited that, "Specifically excluded from the subject of this motion are those products that defendants sell directly to the franchisees." Accordingly, plaintiffs may continue to pursue their claims with respect to products they purchased directly from IDQ or ADQ.

As to the injunctive claims, "[i]ndirect purchaser status does not bar the plaintiffs from seeking injunctive relief under § 16 of the Clayton Act." *Campos v. Ticketmaster Corporation,* 140 F.3d 1166, 1172 (8th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 865, 142 L.Ed.2d 768 (1999). The order of August 4, 1999, was directed only toward the claim for damages under § 4 of the Clayton Act. Thus, plaintiffs may also continue to pursue their claims for injunctive relief on the monopolization and attempted monopolization claims.